1          UNITED STATES BANKRUPTCY COURT
           EASTERN DISTRICT OF NEW YORK
2
     ---------------------------: Chapter 11
3                                 :
     IN RE:                       : Case No. 1-17-40104
4                                 :
     PRIME SIX INC                : 271-C Cadman Plaza East
5                                 : Suite 1595
                                  : Brooklyn, New York,
6                                 : 11201-1800
                                  :
7                    Debtor : April 18, 2018
     ---------------------------
8
               TRANSCRIPT OF MOTION TO
9
        BEFORE THE HONORABLE CARLA E. CRAIG
10      CHIEF JUDGE UNITED STATES BANKRUPTCY JUDGE

11    [5] Order Scheduling Initial Case Management
     Conference.
12    [109} Order that the Debtor, Prime Six, Inc,
     and/or any party in interest or their attorneys show
13   cause why an Order should not be entered (a) to lift
     the stay for Landlord to bring an eviction of Debtor
14   for Debtor's Conduct in impairing the quiet enjoyment
     of other tenants at 242 Flatbush Avenue, Brooklyn, New
15   York (the "Premises") and failing to exercise adequate
     supervision over the conduct of its Premises that has
16   permitted the Premises to become disorderly in
     violation of the Alcoholic Beverage Control Law; (b) to
17   compel Debtor to pay post-petition rent due, and/or (c)
     Dismiss the Case with Prejudice; and (d) granting the
18   Landlord such other and further relief as the Court
     deems just and proper.  (RE: related documents(s) [108}
19   motion for Relief from Stay.
      Confirmation Hearing.
20

21

22             AudioEdge Transcription, LLC
               23 Vreeland Road, Suite 204
23         Florham Park, New Jersey 07932
                   (973) 618-2310
24          www.audioedgetranscription.com

25

1          Proceedings recorded by electronic sound recording,

2      transcript produced y certified transcription service

3

       APPEARANCES:
4      For the New York State        ENID STUART , ESQ.,
       Department of Taxation:       New York State Attorney
5                                    General

6                                    New York, New York 10271
       For Prime Six Inc.            RANDALL S. D. JACOBS, ESQ,
7      Debtor:                       RANDALL S. D. JACOBS, PLLC
                                     30 Wall Street, 8th Floor
8                                    New York, New York 10005

9      For U.S. Trustee:             RACHEL WEINBERG, ESQ.,
                                     Office of the United States
10                                   Trustee, Brooklyn Office,
                                     U.S. Federal Office
11                                   Building
                                     201 Varick Street,
12                                   Suite 1006
                                     New York, New York 10014
13     For IRS Department of         EDWIN R. CORTES, ESQ.,
       the Treasury, Creditor:       U.S. Attorney's Office
14                                   EDNY
                                     271-A Cadman Place, East
15                                   Brooklyn, New York 11201
       For Fang Reality, Inc,        DAVID J. DOYAGA, ESQ.,
16     Creditor:                     26 Court Street
                                     Suite 1601
17                                   Brooklyn, New York 11242

18     For Prime Six, Inc.,
       Debtor:
19

20

21

22

23

24

25

1                              I N D E X

2

3    SPEAKER:                              PAGE(s)

4

5

6    MR. JACOBS:                  4, 16, 19, 21. 22. 29, 38

7

8    MR. DOYAGA:                    14, 18, 20, 22

9

10   MS. WEINBERGER:                    18, 40

11

12   MR. OFSHTEIN:                      35

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT CLERK: Calender number 36, 37 and
2      36, Prime Six.  Case 17-40104.
3           MR. DOYAGA: For the Creditor, Fang Reality,
4      David J. Doyaga, Senior.
5           THE COURT CLERK: Appearances.
6           MS. WEINBERGER: Rachel Weinberger on behalf
7      of the United States Trustee.
8           MS. STUART: Enid Stuart of the New York State
9      Attorney General's Office for the Department of
10     Taxation.
11          MR. CORTEZ: Right.  Edwin Cortez from the
12     U.S. Attorney's Office on behalf of the IRS.
13          MR. JACOBS: Good afternoon, Your Honor.
14     Randall Jacobs for the Debtor.  I have with me Denis
15     Abramowitz, the accountant for the Debtor, and Mr. Off
16     stein (phonetic) , Sole Stocker (phonetic).
17          Ready?
18          THE COURT: Okay.  Go ahead, please.
19          MR. JACOBS: As Your Honor may have seen, I
20     have filed a certification of balance, and I'm pleased
21     to advise that the plan has been accepted by the
22     Creditors to the extent that they voted and, although
23     that we're not a lot of votes, they was several
24     creditors who had, apparently, moved.  Left no
25     forwarding address or gone out of business.

1          But I got back about ten returns.

2          Other than that, all the creditors were

3     notified and we got a, essentially, potential plan.

4          There was one vote that didn't specify the

5     amount, I didn't count that.

6          Ah, do you want to deal with the objections,

7     first, Your Honor?

8          THE COURT: Yes.

9          MR. JACOBS: Okay.  Ah, as the Court may have

10     read from my note, from the filings, there was a

11     limited objection filed by the U.S. Trustee's Office,

12     with respect to a couple of items.

13          The lawsuit giving an item was the amount of

14     the amended proof of claim filed by the United States -

15     - the Fed -- the New York State Department of Taxation,

16     on April 2nd; which increased the amount of their

17     priority and secured and unsecured plan to buy

18     approximately $50,788.71, I believe.

19          This resulted, apparently, from an amended

20     tax return that was filed by the Debtor's Accountant,

21     regarding prior history, going back as far as, I think,

22     the previous years of the prior bankruptcy in 2015.

23          That resulted in changes that caused the

24     increase in the taxes to New York State.

25          Which I wasn't aware of.

1              But we went through it, and so far, we've

2      agreed to it, conceptually, and we agreed to amend the

3      confirmation order to include a reference to the change

4      in additional taxes, so that results in a payment of

5      approximately $529.50 -- and five cents a month,

6      additional, that has to be made each month by the

7      Debtor, pursuant to the plan.

8              THE COURT: For a -- for a total of how much

9      to be paid --

10             MR. JACOBS: $14,553.85, by last count.

11             The other objection was to the Debtor's, um,

12     um, Mr. Ofshtein (phonetic) financial support for the

13     Debtor.

14             We supplied a copy of his last tax return.  I

15     think that's sufficient.  It shows a substantial amount

16     of income.

17             I've also -- I'm able to provide personal

18     bank accounts, but I'd rather not do that unless we

19     have to.  I think it's sufficient that he's already put

20     up $105,000 last summer when he had to, he came up with

21     the cash.  And he's been able to cover all the expenses

22     so far.

23             There have been no administrative plans other

24     than that by the landlord, which we oppose, but we can

25     go into that later if you'd like.

1           But I think that the -- the issue about the

2    Debtor's ability to fund the plan or pay for it, has

3    been dealt with.  And I believe we have no objection

4    remaining from the Trustee's Office on that.

5           MS. WEINBERGER: That's -- that's incorrect,

6    Your Honor.

7           Basically, the Debtor did provide tax returns

8    to the United States Trustee, and -- and filed them on

9    the docket.  But that doesn't explain whether the

10   Debtor -- the Debtor's principal has enough cash to

11   make these payments.  And this is the principal --

12   well, was personally liable, the law firm's expenses

13   may exceed the income generated by the tax return.

14          And, at the very least, the Debtor's

15   principal should sign some sort of affidavit that he is

16   able to contribute.

17          THE COURT: Is this -- of it -- the tax return

18   is for his law firm?

19          MS. WEINBERGER: Yes.  It's for his -- it's

20   for the --

21          THE COURT: It's not for him personally?

22          MS. WEINBERGER: The Ofshtein Law Firm PC.

23          MR. JACOBS: It's a -- it's a one sole

24   propriership.  It's a one man firm, Your Honor.  So

25   there are no other sources of income.  All the income

1    is his.

2              Whether -- if an affidavit is required, we

3    will provide it.  That's -- it's easily done, Your

4    Honor.

5              THE COURT: Does -- what -- what will the

6    United State Trustee's Office like to see?

7              MS. WEINBERGER: Well, Your Honor, we'd like

8    to see, at the very least, that the principal should

9    provide an affidavit that he is the financial ability

10   to pay, number one, $7500 a month towards the plan

11   payments.

12             And that number may need to go up in light of

13   the fact that the taxing authority's claim is

14   increased.

15             And, that he also has the financial ability

16   to make a $50,000 payment in legal fees; and

17   professional fees, on behalf of the Debtor.

18             MR. JACOBS: Your Honor, if you'll note, that

19   in the -- in the plan funding agreement, we have

20   provided for an agreement made between the

21   professionals and the Debtor, and they agreed -- agreed

22   to take payments over a course of months when the

23   Debtor's business is highest in most -- the greatest

24   volume is generated, and the balance will be paid at

25   the -- at the same period.  We have no problem taking

1    those payments over time.

2         THE COURT: Does their operating report show

3    cumulative -- cumulative?  It does, doesn't it?

4         Okay.  You're operating -- does your most

5    recent operating report show cumulative operations for

6    the period since the filing?

7         Will your -- the -- they're all -- they're

8    all supposed to show that.

9         Because I -- I'd like to take that number and

10   divide it by the number of months you've been in and

11   see how you've done on the average.

12        Do you have that?

13        Is that --

14        MR. JACOBS: I'm sorry, Your Honor.

15        Your Honor, Mr. Abramowitz advises that

16   that's not available yet, because you have to change

17   the amounts due on taxes.  That changes all the

18   numbers.

19        But the bottom line is, the last monthly

20   operating report shows a profit of a hundred -- a

21   hundred thousand dollars plus.

22        THE COURT: I -- I -- you know, I'll -- I hope

23   that you'll forgive me, but this case has been in

24   bankruptcy for over a year now, and I don't remember

25   what deficits you ran at, on other -- and other

1      periods, so as to be able to --

2                MR. JACOBS: Your Honor, since the filing --

3                THE COURT:  -- figure that.

4                MR. JACOBS:  -- um, I -- I could update that

5      if you'd like, but I thought that we were clear, since

6      the filing in February, on the plan and disclosure

7      statement, with exhibits attached to -- to that had as

8      -- as of those days.

9                All the cash flow, profits and the months

10     that had sustained losses as well as it showed, of the

11     cash that you requested.

12               We amended all the prior -- well, the

13     operating reports to show that as well.

14               THE COURT: So -- but -- so the monthly

15     operating reports through what month show cumulative

16     results?

17               MR. JACOBS: I believe it was last month.

18               THE COURT: Through -- through February;

19     right.  Is that right?

20               MR. JACOBS: I believe that's correct.

21               MS. WEINBERGER: Your Honor, the United States

22     Trustee had crunched it, the numbers, based on the

23     monthly operating reports filed in the Debtor, and that

24     the Debtor has a net monthly average income of $11,153.

25     And we're -- and that's -- and that's not sustainable

1       or enough to make plan payments of minimum $1400 --

2       $14,000 a month.

3                THE COURT: And that's where the plan funding

4       agreement comes in.

5                MS. WEINBERGER: That's correct, Your Honor.

6                THE COURT:  Okay.  So I'm looking at the

7       February report to see that -- to see cumulative

8       operations.

9                Are they in there?

10               No, they're not.

11               Is this a -- is this really a small business?

12               Right.

13               So you've -- you've come -- crunch -- you're

14      numbers crunching went through what not -- what month?

15               MS. WEINBERGER: Through February 2018, Your

16      Honor.

17               THE COURT: Through February.

18               Okay.  So they should have gotten a big -- a

19      boost in March, if they showed $100,000.  But -- okay.

20               Don't you think that's enough to show that

21      with the -- if you're satisfied that the -- that Mr.

22      Ofshtein can and will make these contributions,

23      wouldn't that be enough?

24               MS. WEINBERGER: Well, Your Honor, two

25      arguments.

```
1              One, if the Debtor's principal was liable all
2      this time, why wasn't he making plans -- making
3      payments?
4              THE COURT: Excellent --
5              MS. WEINBERGER: And that's --
6              THE COURT: Excellent question.
7              MS. WEINBERGER: And that -- and that's,
8      perhaps, you know --
9              THE COURT: We hear mumble, mumble, bad
10     management.  We've changed.  It's all different now.
11             Of course, Mr. Ofshtein was always the
12     principal, but -- so what, you know.
13             MR. JACOBS: He was the manager, Your Honor.
14             That's -- that's --
15             THE COURT: Well, he -- he has the bad
16     judgment to delegate the management to somebody else.
17             MR. JACOBS: No dispute there.
18             MS. WEINBERGER: And then the second question
19     --
20             THE COURT: And he wasn't -- he wasn't
21     contributing money to fund the -- fund the restaurant
22     at that point.
23             MR. JACOBS: Your Honor, as far as I know,
24     they didn't know what was going on one way or the other
25     until we actually took a good look at it when we took
```

1   over the case after the last Chapter 11.

2            THE COURT: Until you rode in on your white

3   horse to save the day.  Okay.

4            MR. JACOBS: Well, I'll let -- if March was in

5   harbinger for the rest of the year, this should be a

6   very good year for the Debtor.

7            THE COURT: Yeah.  Okay.

8            But, anyway, you were saying?

9            MS. WEINBERGER: And then another point is

10  that this plan funding agreement, although it may

11  obligate the principal to make the payments, there's

12  nothing independently saying that the principal

13  actually has the financial wherewithal to make these

14  payments.

15            While the -- while the Debtor did disclose

16  some confidential financial information regarding the

17  principals law firm's financial wherewithal to -- in

18  terms of profit, there's no individual affidavit from

19  the principal saying, that he actually has the cash.

20            THE COURT: Yeah.

21            Well, let's -- let's think about what we --

22  what we would want to see to satisfy ourselves on that

23  point.  And maybe your office wants to -- to take -- to

24  conduct some discovery.  But you can tell me what it is

25  you want to see in terms of additional support for the

1    -- his -- his assertion that he's going to be able to

2    make these payments.

3            MR. JACOBS: The affidavit they requested?

4            MS. WEINBERGER: Perhaps an affidavit.

5            THE COURT: That --

6            MS. WEINBERGER: But, Your Honor, that this

7    information should be made public and, at the very

8    least, available to the Court to satisfy the concerns

9    of -- of both the United States Trustee, the Court and

10    the creditors, that this plan will actually not

11    default, because there's enough cash.

12            THE COURT: Just an affidavit?

13            Anything else?

14            MS. WEINBERGER: Ah --

15            MR. DOYAGA: Judge, if I may. usually there's

16    a period of track record of making those deposits even

17    to escrow, to show that they can be made.

18            And that's a -- that's another way that

19    that's done traditionally.

20            THE COURT: Well, he's -- the -- the Debtor's

21    principal, did pay --

22            MR. DOYAGA: That's correct.

23            THE COURT:  -- a substantial chunk of money

24    last year to bring your client current.

25            MR. DOYAGA: That's correct.

1              THE COURT: Correct?

2              MR. DOYAGA: That's correct, Judge.

3              I'm just -- I'm just trying to suggest an

4        (indiscernible).

5              THE COURT: Well, do you think you -- you --

6        what do you suggesting?

7              Are you suggesting that we differ

8        confirmation for a number of months or something like

9        that?

10             I mean, there would -- there -- it wouldn't

11       be any need for a contribution at this point.

12             MR. DOYAGA: No, no, Judge, I'm --

13             THE COURT: Because he's -- they 've got the

14       cash right now.  I guess.

15             MR. DOYAGA:  No, I understand, Judge.

16             I'm just trying to suggest the solution.

17             THE COURT: I'm just -- well, I'm trying to

18       understand what you're sug -- what you -- what you're

19       suggesting.

20             MR. DOYAGA: It -- it -- general -- it -- very

21       often what's done is, they show a track record of --

22             THE COURT: But --

23             MR. DOYAGA:  --  making the deposits.  But

24       now we're here --

25             THE COURT: Have -- have they done -- have

1    they not done that?

2             Or how would we do -- how would we --

3             MR. DOYAGA: No, you make --

4             THE COURT:  -- how would we do that?

5             MR. DOYAGA: Your Honor, you make the good

6    point that they paid those -- those rental arrears.  So

7    they have made those payments --

8             THE COURT: Okay.

9             MR. DOYAGA: -- through -- so I get it.  I

10   understand.

11            MS. WEINBERGER: I -- yes, Your Honor.  The --

12   the very minimum that the Debtor's principal should

13   sign an affidavit that he has the financial wherewithal

14   to make the -- the -- the make up the shortfall.

15            THE COURT: Do you want more detail than that?

16            MS. WEINBERGER: Well, that --

17            THE COURT: Do you want to see his individual

18   tax return?

19            I think that might make sense.  'Cause he --

20   I'm sure he signs a -- he files an individual return as

21   well, correct?

22            We don't -- we know -- we don't know what

23   other obligations he has.

24            MR. JACOBS: Your Honor, I would suggest --

25            THE COURT: What other business interests he

1    has.

2              Umm.

3              MR. JACOBS: Your Honor, I would suggest that

4    in addition to the affidavits we can get a personal

5    financial statement, again, we have by Mr. Abramowitz

6    is familiar with the Debtor's operations as well as the

7    principal's, ah, finances.  And that should be

8    sufficient.

9              THE COURT: Get a bank statement?

10             MR. JACOBS: Well, I've already provided them

11   --

12             THE COURT: Is that -- what -- is that what

13   you just said?  I didn't --

14             MR. JACOBS: No, a personal financial

15   statement.

16             THE COURT: Peroneal financial statement.

17             MR. JACOBS: Right.  In addition to the

18   affidavit.

19             THE COURT: Well, what about a personal tax

20   return?

21             MR. JACOBS: If that's absolutely necessary,

22   Your Honor, we -- we could do that; but I'd rather put

23   that in the terms of a private confidential showing to

24   the Trustee's Office than rather than make it public.

25             MS. WEINBERGER: Your Honor, I -- I've -- the

1    U.S. Trustee believes that an affidavit should suffice,

2    for, at the very least, to piggyback on this -- this

3    executed agreement obligating the principal to make

4    payments.

5          'Cause, if he signs under the penalty of

6    perjury that he has the financial wherewithal to make

7    the payments, then, that should be able to stand on its

8    own.

9          MR. JACOBS: It's agreeable to the Debtor.

10          THE COURT: All right.  Okay.  That's fine

11    then.

12          MR. JACOBS: Thank you.

13          THE COURT: Anything else?

14          Any other objections from the Trustee's

15    Office?

16          MS. WEINBERGER: No, Your Honor.  The two

17    other issues regarding the Department of Labor claim

18    and the New York State Taxing Authority claim; both of

19    them resolved, and the Debtor will update the

20    confirmation order with the appropriate language.

21          THE COURT: Okay.  All right.

22          MS. WEINBERGER: Thank you.

23          THE COURT: What about you, Mr. Doyaga?

24          MR. DOYAGA: Judge, my objection, they did pay

25    the April rent, since I put in the objection.

1          THE COURT: So the issue is they've been

2    paying the rent late every month; right?

3          MR. DOYAGA: Yeah.

4          THE COURT: So what does that say about their

5    ability to make plan payments going forward?

6          MR. DOYAGA: It indicates that there's a

7    problem.

8          I mean, usually people don't pay late on

9    purpose.  And --

10          MR. JACOBS: Your Honor, I disagree,

11    respectfully, with Mr. Doyaga, a business is run,

12    especially ones during the colder months when their

13    income is lower; hopefully except for this last March.

14          They make payments when it's appropriate to

15    make payments.  And if they pay them late, they pay the

16    late charges, which is the better use of money.

17          THE COURT: Is that okay?

18          Is that --

19          MR. JACOBS: It's in -- it's in the lease.

20          MR. DOYAGA: If she -- when it's -- when it's

21    a funding plan, it's problematic.  When it's a funding

22    plan; because the theory is that when they're short the

23    funder puts forward the loan, the money.

24          So, paying late does appear to be a problem.

25    And, if there was some -- I'm here to protect my

1     client, Judge.

2         If there was a provision that confirmation or

3     a concern of paying on time.

4         But the point is, it does indicate a problem.

5         MR. JACOBS: Your Honor, I disagree.

6         I think what it really indicates is a

7     function of the dispute between a Landlord and the

8     Debtor regarding this $26,000 water bill, which we will

9     deal with at another time.

10         But as it turns out, there is no $26,000

11     water bill.  It's a bill from the Water Department for

12     the entire building, not from my client.

13         So they never apportioned it among the

14     tenants so that his share could be determined.

15         So Mr. Doyaga's client demanded payment of

16     the whole amount.  Even, including last summer when he

17     paid the settlement amount, that included $24,000 in

18     water charges.  Which is unfathomable as to being one

19     tenth (indiscernible).

20         MR. DOYAGA: But this is -- it's not about the

21     20 -- they didn't pay the 26,000.  This is not about

22     that.

23         This is about the basic rent.

24         The basic rent was late.

25         That issue with the water bill is being put

1        aside for dispute over the administrative claim.

2                    But that's not really accurate.  It's not

3        really accurate.  That's not what this is about.

4                    This is about --

5                    THE COURT: So is -- so --

6                    MR. DOYAGA: -- ability to pay.

7                    THE COURT: Okay.  So, it's a very unappealing

8        position that you're taking, Mr. Jacobs; that, well,

9        the Debtor's entitled to pay late, you know.

10                   If they -- as long as they pay the late --

11       the late fee, they can pay late.

12                   MR. JACOBS: Well that's the agreement.

13                   That's what the lease says.

14                   If the lease said you had to pay it on the

15       first of the month --

16                   THE COURT: If he's able -- if he's not able

17       to pay the rent, is he purposely paying the rent late

18       or is he -- he can't pay the rent on time, is what --

19       is what it tells you.

20                   MR. JACOBS: Your Honor, as far as I

21       understand, they pay the rent when it's appropriate to

22       pay the rent --

23                   THE COURT: What is appro -- it's appropriate

24       to pay the rent when it's due.  Unless you --

25                   MR. JACOBS: It's -- but --

1            THE COURT: Unless you can't pay the rent when

2      it's due, in which case, you have a penalty that you

3      have to pay.

4            So, you're telling me that they're -- you're

5      not telling me they're choosing to pay a penalty

6      because they'd rather do that.  They can't pay the rent

7      on the first of the month.

8            MR. JACOBS: No, Your Honor, I think that's a

9      mis -- an overstatement.

10           There are various months in the year --

11           THE COURT: Is there -- is there any month

12     that they paid the rent on the first of the month?

13           MR. DOYAGA: Not in the last five months, Your

14     Honor.

15           MR. JACOBS: The last five months are the

16     slowest months of the year.

17           MR. DOYAGA: It's a funded plan.  It's not

18     about the operations of the -- the idea is that they're

19     going to be funding it.

20           I --

21           MR. JACOBS: Your Honor, if the --

22           MR. DOYAGA: I --

23           MR. JACOBS: If the Landlord requires some

24     sort of assurance the rent will be paid on time, I

25     could provide something to that effect.  And if you

1    want to increase it -- the penalty --

2              THE COURT: Okay.  What would be -- what would

3    be the nature of the assurance?

4              MR. JACOBS: That Mr. Ofshtein will cover any

5    payment that has to do by the tenth of the month,

6    whenever it's due, and make sure it gets paid.

7              THE COURT: So when's it due and when's the

8    late period?

9              MR. JACOBS: Well, it's due -- due by the 5th,

10   I believe, if my recollection is correct.

11             THE COURT: And when's the period after --

12   after which -- during which a late -- you -- you -- so

13   you can pay it up 'til when with the last charge?

14             MR. JACOBS: My memory's from the 5th --

15             THE COURT: Without being in default?

16             MR. JACOBS:  -- from the 5th to the 10th.  But

17   I -- I'll have to take a look at the least, Judge.

18             But I -- I think the suggestion that the

19   principal undertake to -- to guarantee it, in effect,

20   with some kind of provision or confirmation order would

21   be satisfactory.

22             But, of course, it doesn't go to the question

23   of feasability.

24             THE COURT: So you're --

25             MR. DOYAGA: You're Honor --

1          THE COURT: You're asking for a guarantee of

2     the lease by the principal?

3          MR. JACOBS: No, the payment that's due.  The

4     monthly payment.

5          THE COURT: Ah-huh.

6          MR. JACOBS: That's really -- that's really

7     what he's doing.

8          THE COURT: Right.

9          MR. JACOBS: Isn't it?

10          MR. DOYAGA: Right.

11          MR. JACOBS: Your Honor, I've just spoken with

12     Mr. Abramowitz, the accountant, who advises that the

13     Debtor would be willing to put up two months of rents

14     in advance to cover any late charges, et cetera, and

15     whatever Mr. Doyaga's client believes is due.

16          But as I understand it, it's a matter of a

17     couple of days by the time they pay the rent.  It's not

18     like it's due on the 10th and it's not paid until the

19     29th.

20          It's late.

21          MR. DOYAGA: That is true.

22          MR. JACOBS: But if I put two months in a --

23     in a -- in a security account, and hold it in escrow,

24     and he hasn't the ability to draw on it, whenever he

25     thinks it late, that's no problem.

1            THE COURT: Don't you think that should be

2       sufficient, Mr. Doyaga?

3            MR. DOYAGA: Yes, Judge.

4            THE COURT: Okay.  All right.

5            All right.

6            So, you'll need to file that affidavit before

7       you submit your opera -- your confirmation.  And I'd

8       like you to now make your proffer with respect to

9       Section 1129.

10           MR. JACOBS: Yes, Your Honor.

11           THE COURT: Unless anybody else wants to be

12      heard before that.

13           Okay.  Go ahead.

14           MR. JACOBS: Your Honor with respect to this

15      plan --

16           THE COURT: And I -- I am assuming this is a

17      proffer of the testimony that Mr. Ofshtein would give

18      if he were called to the stand, and that he will be

19      asked, once you're done, to say whether -- to -- to

20      indicate, under penalty of perjury, that he -- that

21      this is, in fact, the testimony he would offer?

22           MR. JACOBS: Yes, Your Honor.

23           THE COURT: Okay.  Go ahead.

24           MR. JACOBS: This is the only proposed plan in

25      this case.  There are no other competing plans.

1          The Proponent is entitled to propose this

2     plan because he has confirmed the disclosure and this

3     would be (indiscernible) requirements of -- I'm -- I'm

4     sorry.

5          The plan is conformed to disclosure, so it

6     states the requirements 1123 and 1125.

7          The plan was proposed in good faith and not

8     by any means was written by law.

9          The purpose of the plan is not the avoidance

10    of taxes, as evident from just the plan, by itself, as

11    well as the involvement of repayment of taxes.

12         Under Section 4 -- 5, the Securities Act

13    1933.

14         The plan prohibits the issuance of non-voting

15    equity securities and provides for an appropriate

16    distribution of voting power and one of the equity

17    security holders, which is Mr. Ofshtein.

18         The administrative claims, the proponent has

19    disclosed all payments already made, or proposed to be

20    made under the plan, any payments to be made prior to

21    the confirmation if it reasonable.

22         The only one that is at issue, as Mr. Doyaga

23    had mentioned, is this water bill for the sum of

24    $25,000.

25         Which the Debtor intends to object to or he

1    can resolve that later.

2           All administrative or involuntary gap

3    expenses will be paid in full on the effective date, if

4    any.  We don't believe there are any.  We believe there

5    was one tax claim from the New York State Department of

6    Finance and Taxation; that we -- with respect to some

7    $14,000, which was paid.

8           There's as penalty part of that on top of it.

9    But that's supposed to be refunded as soon as they get

10   the payment for the 14,000, I have advised.

11          With respect to the claims and interest; all

12   the classes -- claims -- all the claims and interest

13   have been properly designated.

14          We have had no objections to any of the

15   designations.

16          In fact, there was one minor change we made

17   during the plan -- plan discussion period, in, I think,

18   it was January, where a minor change was made.

19          Everybody else has agreed to it.

20          We believe the plan is in the best interest

21   of the Debtor and the Creditors.

22          The -- any dissenting holders of claims or

23   interests will receive or retain a property valued as

24   of the effective date of the plan, that is not less

25   than the amount that the holder is so received or

1          retained that the Debtor will liquidate it.

2                    As the Court may recall, this is an unusual

3          kind of case.  I don't know how many you've seen like

4          this.

5                    The assets in the -- of the Debtor are

6          relatively small.

7                    It's a restaurant that leases stuff and has

8          old equipment.

9                    However the operation of it can be

10         profitable, as the Court has seen.

11                   So, the only way that anybody gets paid in

12         this situation is, if the Debtor continues and

13         operating.

14                   That's the idea.

15                   So, if the Creditors were getting more now

16         than they would get any other way, there's no other way

17         to get any (indiscernible) to get anything.

18                   With respect to the holders of secured

19         claims.

20                   The holder of the claims and member of a

21         class to which Section 111(b)1 applies:

22                   Such holder will receive or retain, under the

23         plan property, a value that is not less than the value

24         of such creditor's interest in the collateral securing

25         the claim.

1           As I indicated, there's very little

2     collateral anyway.

3           Okay.

4           THE COURT: What about -- what about the

5     likelihood --

6           MR. JACOBS: I'm sorry, Your Honor, I can't

7     hear you.

8           THE COURT:  -- of the confirmation will be

9     followed by liquidation or the need for further

10    financial reorganization?

11          MR. JACOBS: I'm sorry, I -- I can't hear you,

12    Your Honor.

13          THE COURT: I said, what about feasibility?

14          MR. JACOBS: Yes,

15          THE COURT: You haven't addressed that.

16          MR. JACOBS: The means of the plan to be

17    executed, I believe, are clear.

18          Adequately, it's been established, and we

19    provided for in the confirmation plan.

20          It's not likely to followed by liquidation

21    because of the guarantee by Mr. Ofshtein to cover any

22    shortage in the plan payments, including the additional

23    $500 a month from the amended proof of claim filed by

24    New York State.

25          It's still well within in his capability, as

1    well as the Debtor's apparent growth now.

2            If -- if March's profits are any indication,

3    there shouldn't be any problem.

4            THE COURT: It's -- it's hard to generalize

5    from one month.

6            MR. JACOBS: I agree.  And the -- and the

7    Debtor's income, we know, of course would back the

8    monthly operating reports, very significantly from up

9    to $75,000 in profits to up to $90,000 loss; it's true.

10           But, hopefully, the new management situation

11   may be --

12           THE COURT: All right.  Well, tell me about

13   this new management situation.

14           Who is the old management?

15           Who's the new management?

16           MR. JACOBS: The old management --

17           THE COURT: When did that get changed?

18           MR. JACOBS: That was changed in the -- during

19   the, or just after the old --

20           THE COURT: Okay.  Who -- who are -- who --

21   who is management?

22           We say management.

23           One person?

24           Two people?

25           What are their names?

1       What are their jobs?

2      MR. JACOBS: And there are at least several

3  people in management.  Mr. -- what's his last name?

4      (Someone speaking, indiscernible)

5      MR. JACOBS: Robert, it's a Russian name, I

6  can't pronounce it, Your Honor.

7      It starts with Sof -- Petro something.

8      He's running the operation now, as opposed to

9  whatever is being run before.

10     THE COURT: Okay.  Before when?

11     MR. JACOBS: In -- during the prior Chapter

12  11, that they could not comply with.  They had --

13     THE COURT: Okay.  And well, what happened

14  before that?

15     I mean, what's -- give me -- give me some

16  more history here.

17     MR. JACOBS: All right, is -- as I understand

18  --

19     THE COURT: I've heard of that -- I've heard

20  old management was bad, new management's great.

21     I don't know when -- who they were.  When

22  they changed.  What -- what is -- is there one manager?

23     Is there -- are there two managers?

24     MR. JACOBS: Your Honor, what happened --

25     THE COURT: What's Mr. Ofshtein's job?

1                    Is he the manager?

2                    MR. JACOBS: No, Your Honor.

3                    What I -- what I'm advised -- remember, I was

4        invited from the first Chapter 11.

5                    What I understand --

6                    THE COURT: Then you must understand the

7        history of it as -- as their counsel --

8                    MR. JACOBS: Yes.

9                    THE COURT:  -- as their counsel.

10                    MR. JACOBS: Yes.  And what --

11                    THE COURT: And then since you're making the

12       assertion to me that -- that everything is going to be

13       fine, feasibility-wise, notwithstanding their prior

14       problems because of this change in management; you must

15       know -- you must understand -- you must have probed

16       that -- that assertion, I assume.

17                    MR. JACOBS: Yes, Your Honor.

18                    THE COURT: So let's hear.

19                    MR. JACOBS: What happened, as I am advised,

20       what happened was this.

21                    They started out looking like it was going to

22       be a very successful operation.  They thought --

23                    THE COURT: Started out when?

24                    MR. JACOBS: Back in 2015.

25                    THE COURT: Okay.

1          MR. JACOBS: And they thought they were going

2     to be doing fine when they opened up.

3          As a result of the initial manager's

4     inability to control the cash flow --

5          THE COURT: And who is the initial manager?

6          MR. JACOBS: He left before I got involved.

7          THE COURT: But what was his name?

8          MR. JACOBS: I don't have a record of it

9     (indiscernible).

10         AN ATTORNEY: His name was, ah, Arthur, I

11    apologize, Your Honor, I can't recall his last name at

12    this point.

13         MR. JACOBS: This goes back two or three

14    years, Your Honor.

15         He was replaced and when I got involved --

16         THE COURT: Was he -- was he a principal?

17         Was he just -- was he an employee?

18         What was his -- how did -- how did --

19         MR. JACOBS: He was a manager.  He wasn't a

20    stockholder.  Strictly --

21         THE COURT: Right.  But in restaurants, very

22    often, the people who are running it also have an

23    interest in the restaurant.

24         MR. JACOBS: No, he had no interest.

25         Mr. Ofshtein's the sole stock --

1          THE COURT: He was an -- he was just an

2    employee?

3          MR. JACOBS: Yes.  And Mr. Ofshtein is the

4    sole stockholder, and always has been.

5          THE COURT: Okay.

6          MR. JACOBS: Right.  The -- the fellow who he

7    hired to run it, Mr. Ofshtein's an attorney as of a --

8    a law practice.

9          THE COURT: Right.

10          MR. JACOBS: The fellow he hired to run it was

11    -- his name was Arthur whatever.

12          Apparently, he did not know what he was

13    doing, but told Mr. Ofshtein he did.  And Mr. Ofshtein

14    relied upon him.

15          And when he found out what was going on, it

16    was already to the point where the taxes were well

17    behind -- well due, over due rather.  And the --

18          THE COURT: And when -- when was that?

19          MR. JACOBS: That's in 2015, '16, when they

20    first consulted another bankruptcy attorney and filed

21    that boarded petition in two thousand -- I think it was

22    May of 20 -- 2015; which was dismissed in 2016, I

23    believe.

24          So, the -- the change in management has been

25    -- made the thing entirely different.  It's a different

1          structure.

2                    THE COURT: Okay.  So when -- and when was the

3          new manager brought in?

4                    And who is he?

5                    Is it -- has there been more than one?

6                    MR. OFSHTEIN: There's several.

7                    May I speak.

8                    THE COURT: Yes.  Please.  That would probably

9          be helpful.

10                   MR. OFSHTEIN: Thank you.

11                   THE COURT: Why don't you please stand up and

12         come to the microphone.

13                   MR. OFSHTEIN: Sure.

14                   THE COURT: State your name.

15                   MR. OFSHTEIN: Your Honor, good afternoon.

16         It's Kiva Ofshtein, ah, principal for Prime Six.

17                   Of Iron Professional, ah, Management Group,

18         American Standard Hospitality Group.

19                   A completely professional --

20                   THE COURT: And when did you do that?

21                   MR. OFSHTEIN: I did that, I wanna say, in

22         early, the late 2016 or early 2017, I don't recall the

23         exact date.  But this is a professional group.  They

24         manager everything.  Everything is now on point.

25                   We do have our slower periods, of course,

1       but, ah, everything gets paid within the 30-day period.

2       We have high payroll.  This is a very high functioning

3       restaurant with a very high capacity of employees.

4               So, payroll taxes, all of those things have

5       to come out simultaneously.

6               Ah, employees don't like to wait for their

7       paycheck, nor should they.

8               So, we're in a situation where we're always

9       crunching.

10              THE COURT: So -- so who was -- was the -- who

11      was running -- was the -- was Arthur, last name not

12      sure of, running it through -- through the prior

13      bankruptcy?

14              MR. OFSHTEIN: Correct.  He was -- he was just

15      the manager that was running a business that had

16      claimed to have experience, and he -- he didn't have

17      the experience needed to run this type of operation.

18              I brought him --

19              THE COURT: And so you fired him when?

20              MR. OFSHTEIN: I don't recall the dates, Your

21      Honor, but I -- but I fired him when I realized things

22      were just, you know, in dire straights.  So --

23              THE COURT: So did you hire this hospitality

24      group right -- right when -- right when that occurred?

25              Or was there something --

1            MR. OFSHTEIN: Well, it took a little bit of

2      time to find them.  It took a little bit of time to

3      figure out where we were at.

4            I -- I needed to understand my options so

5      that I could get this done.

6            I'm trying to do this for four years, and

7      this is the most frustrating process.

8            I wanna get this over.  I wanna get on a

9      plan.  I know I can pay it.  I'll sign any affidavit

10     required to make this plan go forward.

11           This is a personal responsibility for me as

12     an attorney, as a person, I realize that.  And you

13     said, from the beginning, this was a -- this was a bad

14     judgment call of an investment opportunity that came

15     across my desk.

16           I made a bad judgment call, but I'm not

17     trying to shy away from it.

18           I'm trying to get it done.

19           I'm trying to get the State paid.

20           I'm trying to get the IRS paid.

21           And everybody else, you know.

22           I, sincerely feel bad about this whole

23     situation.  I've never, in 20 years of practice dealt

24     with something like this.

25           Bad judgment calls should not just bury me.

1          I'm willing to make the sacrifice for the

2     next however many years to get the State paid, to get

3     the IRS paid.

4          I just wish somebody would just see that I'm

5     sincere about the possibility of getting this done,

6     Judge.

7          And I wanna get it done.

8          And this -- every time we delay it's just

9     another 30 days, 45 days, 60 days of -- of massive, ah,

10    stress of not understanding, why can't this just be

11    resolved, because it's just a very tough situation, and

12    I apologize to the Court, sincerely.  I'm -- I'm sorry.

13          THE COURT: Okay.  All right.

14          Thank you.

15          All right.  Was there -- so where were we?

16          MR. JACOBS: We're talking about feasability,

17    Your Honor.

18          And again, I think that covers the primary

19    issue.

20          The Debtor's income, averaging around $11,000

21    plus what Mr. Ofshtein's backup guarantee of that, and

22    we put two months rent in the security account, to

23    cover Mr. Doyaga.  I think that's sufficient clauses

24    affidavit.

25          Mr. -- Mr. Ofshtein, as you've seen by his

1      tax return, which is attached to the opposition papers,

2      to the objection; is substantial.

3              The (indiscernible) will have to cover two or

4      three thousand dollars a month, or even five thousand

5      or seven thousand a month, he had to.

6              THE COURT: All right.

7              Does anybody have any questions that they

8      wanna ask Mr. Ofshtein?

9              By way of --

10             MR. DOYAGA: No, Judge.

11             THE COURT: Okay.

12             Can you -- can you please stand up for a

13     minute, Mr. Ofshtein?

14             MR. OFSHTEIN: Sure.

15             THE COURT: Do you confirm, under penalty of

16     perjury that the proffer that you attorney has made of

17     what you're testimony would be had you been called to

18     the stand is true and accurate in all respects?

19             MR OFSHTEIN:  I do, Your Honor.

20             THE COURT: Okay.  Thank you.

21             MR. OFSHTEIN: Thank you.

22             THE COURT: All right.

23             MR. JACOBS: Your Honor, if I move for the

24     confirmation of the Debtor's plan, as we -- as

25     discussed.

1           THE COURT: Okay.  All right.

2           So, I will -- you need to file the affidavit

3      that has been requested and you can submit a

4      confirmation order.

5           When the -- when the U.S. Trustee indicates

6      that they are satisfied with the affidavit then I will

7      sign the confirmation order.

8           MR. JACOBS: Thank you, Your Honor.

9           MS. WEINBERGER: Your Honor --

10          MR. DOYAGA: Can you see -- I'm sorry.

11          THE COURT: And if you could -- if you could

12     circulate the confirmation order to the -- the parties

13     that are present here today,

14          MR. JACOBS: Certainly.  (Indiscernible) to

15     the State, I arrest sure wanna take a look at it as

16     well as Mr. Doyaga.

17          THE COURT: Okay.  Thank you.

18          MS. WEINBERGER: Thank you, Your Honor.

19          THE COURT: All right.  Well good luck.

20          MR. OFSHTEIN: Thank you.

21          THE COURT: Um-mm.

22          MR. JACOBS: Judge, on my motion, which,

23     obviously, as far as go (indiscernible) to the stay and

24     to dismiss, that's not happening.

25          But, part of it is a motion to compel the

1    payment of the administrative claim, which has not to

2    be heard today.

3            But I'd like to carry that aspect of the

4    motion because I do want to resolve the issue of the

5    water bill.

6            And if they're correct, that's fine.  But I

7    need to have that resolved.

8            So I need an adjourn date just on that narrow

9    aspect.

10           Nothing to do with the confirmation.  Well, I

11   shouldn't say nothing to do with the confirmation, but

12   I'm just saying, is that independent of confirmation.

13           'Cause their date -- there's a claim on

14   record.  That maybe they have the -- they have the --

15           THE COURT: Do you have -- do you have other

16   claims objections that you're going to be filing?

17           MR. JACOBS:  Your Honor, as far as I know,

18   this is the only one we're filing an objection for.

19           THE COURT: Okay.

20           MR. JACOBS: Why don't -- why don't wait until

21   we file the objection and the Court will set a date on

22   the hearing on that.

23           MR. DOYAGA: Well, the only thing is I -- I

24   don't want it to be forever.  I would like it to be

25   promptly.

1            MR. JACOBS: No. It's for -- it's a week.  The

2      date -- the period to file it's only 30 days after the

3      --

4            MR. DOYAGA: Okay.

5            MR. JACOBS: So it's a week.

6            MR. DOYAGA: I'll accept that.

7            THE COURT: Okay.  So then there isn't --

8            MR. DOYAGA: I'll withdraw my motion.

9            THE COURT: Okay.  Thank you.

10           MR. DOYAGA: Thank you.

11           MR. JACOBS: Thank you, Your Honor.

12           THE COURT: Oh, do we need a -- do we need a -

13     - I think we probably need a date for a post

14     confirmation status conference, Mr. Jacobs?

15           THE COURT CLERK: Mr. Jacobs.

16           THE COURT: I think we probably have to set a

17     date for post confirmation status conference.

18           I'll give them -- give them, July.

19           MR. JACOBS: I'm sorry.

20           THE COURT: July 11th.

21           MR. JACOBS: July 11th post conference status,

22     is okay.

23           THE COURT: At 2:30.

24           MR. JACOBS: Two thirty.

25           THE COURT: Um-mm.

1    MR. JACOBS: Thank you, Your Honor.

2    (Whereupon, the proceedings were concluded)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATE

2

3

4

5          I certify that the foregoing is a correct

6    transcript from the electronic sound recording of the

7    proceedings in the above-entitled matter, from 2:42:27

8    PM to 3:15:40 PM, is prepared to the best of my

9    knowledge and ability.

10

11

12

13

14    _____/s/ Diane Amorin_____    _____05/21/2018_____

15    Diane Amorin                                    Date

16    AOC-Certified Court Transcriptionist

17    For AudioEdge Transcription, LLC

18    Certified Court Transcriptionist

19

20

21

22

23

24

25